# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 19, 2012　　　Decided November 9, 2012

No. 09-3120

UNITED STATES OF AMERICA,
APPELLEE

v.

GREGORY WILLIAM FAIR,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cr-00089-1)

---

*Beverly G. Dyer*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A.J. Kramer*, Federal Public Defender. *Neil H. Jaffee*, Assistant Federal Public Defender, entered an appearance.

*Christopher S. Merriam*, Assistant Deputy Chief, U.S. Department of Justice, argued the cause for appellee. With him on the brief was *Lanny A. Breuer*, Assistant Attorney General. *Elizabeth Trosman*, Assistant U.S. Attorney, entered an appearance.

Before: ROGERS and KAVANAUGH, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Gregory Fair pled guilty to copyright infringement, in violation of 17 U.S.C. § 506(a) and 18 U.S.C. § 2319, and mail fraud, in violation of 18 U.S.C. § 1341. Pursuant to the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, the district court ordered him to pay restitution to Adobe Systems, Inc. in an amount equivalent to the revenue he received from his sales of the pirated products. On appeal he contends that the district court abused its discretion because the government failed to offer evidence of Adobe Systems' actual loss, instead offering evidence only of his gain. Because the government did not meet its burden to present evidence from which the district court could determine Adobe Systems' actual loss as a result of the pirated sales, we vacate the restitution order.

**I.**

According to the stipulated facts in the plea agreement, Fair's criminal scheme involved high-volume sales of pirated Adobe Systems' software on eBay. He sold copies of outdated versions of popular Adobe products, such as Adobe Photoshop and PageMaker. Along with the pirated software, he included numerical codes that allowed buyers to update their software to the most recent version at a reduced cost from Adobe Systems. Fair's scheme thus represented a much cheaper route to an up-to-date version of the software. For example, a customer could first buy a pirated copy of outdated PageMaker software and an upgrade code from Fair for around $125 and then pay around $200 to Adobe Systems to upgrade to the most current version. The total price paid, around $325, would be less than half of the retail price of the authentic up-to-date Adobe program (approximately $700).

Fair's infringement scheme lasted from February 2001 to September 2007, after which time an undercover investigation by the United States Postal Inspection Service, based on information from Adobe Systems about unauthorized sales, identified his sales activity. According to records from PayPal, the program used for completing eBay transactions, Fair had received, and he admitted receiving, approximately $1.4 million from his sales of pirated software on eBay. The plea agreement also stated, for purposes of calculating the offense levels under the U.S. Sentencing Guidelines, that "the infringement amount" was greater than $400,000 but less than $1 million. Plea Agreement at 2, 3 (Apr. 16, 2009). It also acknowledged that the MVRA mandated restitution, citing 18 U.S.C. § 3663A, but did not specify an agreed-to amount.

Prior to sentencing, the government provided the probation office with "a spreadsheet summarizing records in the government's possession relating to [Fair']s specific sales." Gov't's Mem. in Aid of Sent. at 6 & Attach. A (Jun. 29, 2009). The spreadsheet showed over 7,000 sales with total sales revenue of $767,465.99, which the government advanced as "a reasonable calculation of the restitution." *Id.* at 6. Fair objected and initially suggested restitution of $455,000, the amount of currency he withdrew from PayPal accounts associated with the fraudulent transactions. *See* Def.'s Mem. in Aid of Sent. at 3 & n.1 (June 26, 2009). He subsequently submitted that (1) restitution under the MVRA must take the form of "actual loss" to the victim; (2) "actual loss cannot be equated to 'intended loss' or to gain by the defendant"; and (3) the government had offered "no proof . . . of any actual loss by [the victim,] Adobe Systems." Def.'s Supp. Sent. Mem. at 1–4 (Sept. 22, 2009). He further suggested that his piracy might in fact have *benefitted* Adobe Systems by increasing consumers' awareness and use of its products. *See id.* at 3.

The government rejected Fair's suggestion that Adobe Systems benefitted from his sales or had any policy of acquiescing to piracy, and argued that "[Fair]'s pirated works cheat[ed] Adobe [Systems] out of sales of full[-cost] versions of its product at the much higher price point." Gov't's Supp. Mem. in Aid of Sent. at 5 (Oct. 13, 2009). Although objecting to Fair's suggestion that his sales revenues should be offset by his costs, the government did not squarely address Fair's argument that the victim's actual loss, not the defendant's gain, should provide the basis for the restitution amount under the MVRA. Rather, the government merely noted that it was "not relying upon a restitution figure tied to the much higher retail price of the legitimate Adobe software, but instead is using the actual sales records and dollar amount sold by [Fair]." *Id*. at 8–9. In its view, "[t]hough admittedly more difficult to quantify" than lost sales, Fair additionally "inflicted other considerable harm to Adobe," such as damage to Adobe's "good name." *Id*. at 9.

At the sentencing hearing on October 22, 2009, defense counsel emphasized that the government had failed to prove the amount of Adobe Systems' actual loss and had not raised sufficient reasons why Adobe Systems could not prove the amount of its loss, but instead relied on how much money Fair earned from the infringing sales. Counsel pointed out that although "several hundred thousand dollars worth of cash and cars were seized from [Fair], all of which were . . . undoubtedly proceeds of this [scheme]," and "Adobe [Systems] applied to get them," the Postal Inspection Service only released approximately $24,000, "decid[ing] that Adobe [Systems] hasn't shown that they deserve [the rest of] that money." Tr. Oct. 22, 2009 at 21. Counsel argued that "[i]f Adobe Systems does not come . . . with some data to indicate . . . that they had sales interrupted that amounted to more than the sales that they clearly got, based upon [Fair's] activity, then . . . they should not be awarded restitution." *Id*. at 21–22. Government counsel

responded that Adobe Systems had provided the spreadsheet but did not have the information Fair sought and "never did a study that showed piracy benefitted them." *Id*. at 24. Otherwise, government counsel referred to screen shots of Fair's eBay listings showing he was advertising his products as genuine, as well as the $455,000 tied to PayPal withdrawals. Defense counsel, in reply, described how Adobe Systems distinguished between persons buying from Fair and those who bought legitimate software and chose as "a corporate strategy" to permit Fair's customers to purchase upgrades but to give no tech support to Fair's software. *Id.* at 26.

The district court sentenced Fair to 41 months' imprisonment and three years' supervised release, and ordered him to pay to Adobe Systems restitution of $743,098.99, an amount representing the total sales listed on the spreadsheet ($767,465.99) less the forfeited funds turned over to Adobe Systems by the Postal Inspection Service ($24,367.00). Looking for "hard proof from the government," the district court reasoned that "[i]t's undisputed that [Fair]'s revenue from the sales of pirated Adobe products was at least $767,000," and that "if anyone held the right to collect revenue from the sale of these products, it was Adobe [Systems]," and so it followed that "since the sales did occur and revenue was generated, and the right to the revenue was held by Adobe [Systems] and not by [Fair], that Adobe [Systems] has the right to be restored to the revenue that it lost [in] its right to collect on actual sales that were made." Tr. Oct. 22, 2009 at 27–28. Fair appeals the restitution order, and our review of a restitution order is for abuse of discretion. *United States v. Bryson*, 485 F.3d 1205, 1208 (D.C. Cir. 2007); *cf. United States v. Leonzo*, 50 F.3d 1086, 1088 (D.C. Cir. 1995).

6

**II.**

Federal courts do not have inherent authority to order restitution. *See United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). A product of the victims' rights movement, *see id.*, the MVRA, 18 U.S.C. § 3663A, is unlike other restitution statutes under which the award of restitution is discretionary, *see Papagno*, 639 F.3d at 1096–97. The MVRA applies only to certain types of crimes, including Title 18 property offenses "in which an identifiable victim . . . has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1). It provides that the restitution order "shall require" that the defendant either return the property or reimburse the victim for his or her "loss" — i.e., the value of the property offset by the value of any part of the property that was returned. *Id.* § 3663A(b)(1). The MVRA is to be enforced pursuant to section 3664, *id.* at § 3663A(d), which requires courts to order the defendant to pay "restitution to each victim in the full amount of each victim's losses," *id.* § 3664(f)(1)(A).

The purpose of the MVRA, then, is "essentially compensatory: to restore a victim, to the extent money can do so, to the position [the victim] occupied before sustaining injury." *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006) (citations omitted). Its authorization is accordingly limited to the actual, provable loss suffered by the victim and caused by the offense conduct. *See United States v. Zangari*, 677 F.3d 86, 91–92 (2d Cir. 2012); *United States v. Arledge*, 553 F.3d 881, 898–99 (5th Cir. 2008); *United States v. Chalupnik*, 514 F.3d 748, 754–55 (8th Cir. 2008) (citing *United States v. Petruk*, 484 F.3d 1035, 1038 (8th Cir. 2007)); *United States v. Hudson*, 483 F.3d 707, 710–11 (10th Cir. 2007); *Boccagna*, 450 F.3d 107, 115–17. Awarding restitution in excess of the victim's actual loss would be punitive in nature and thus fall outside the scope of the MVRA. *See Chalupnik*, 514 F.3d at

754; *Hudson*, 483 F.3d at 710. Because the MVRA does not authorize restitution in excess of the amount of the victim's losses, *see, e.g., Boccagna*, 450 F.3d at 117, *United States v. Beydoun*, 469 F.3d 102, 107 (5th Cir. 2006), it is distinguishable from restitution in the civil law context, where restitution denotes "the law of nonconsensual and nonbargained benefits." RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 1(d) (2011).[1]

The MVRA places the burden on the government to prove the victim's loss by a preponderance of the evidence. 18 U.S.C. § 3664(e). Our sister circuits have required that the district court, in determining "the full amount of each victim's losses," *id*. § 3664(f)(1)(A), articulate the specific factual findings underlying its restitution order in order to enable appellate review. *United States v. Singletary*, 649 F.3d 1212, 1222 (11th Cir. 2011); *United States v. George*, 403 F.3d 470, 473 (7th Cir. 2005).

---

[1] The RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT explains:

> Another context in which the word 'restitution' means something closer to 'damages' is a product of statutes authorizing compensation to victims as a part of criminal sentencing. It is a natural use of the language to speak of requiring a criminal to 'make restitution'; the problem is that the liability imposed in such cases is not based on unjust enrichment but on compensation for harm. To the extent that this aspect of criminal sanctions has a basis in civil obligations, it is found in tort rather than restitution.

*Id*. at § 1(e)(2).

**A.**

The circuit courts of appeals are in general agreement that the defendant's gain is not an appropriate measure of the victim's actual loss in MVRA calculations. *See Zangari*, 677 F.3d at 92–93 (2d Cir.); *Arledge*, 553 F.3d at 899 (5th Cir.); *United States v. Gallant*, 537 F.3d 1202, 1247 (10th Cir. 2008); *Chalupnik*, 514 F.3d at 754 (8th Cir.); *United States v. Galloway*, 509 F.3d 1246, 1253 (10th Cir. 2007); *cf. United States v. Kuo*, 620 F.3d 1158, 1164–65 (9th Cir. 2010); *United States v. Harvey*, 532 F.3d 326, 341 (4th Cir. 2008); *United States v. Badaracco*, 954 F.2d 928, 942–43 (3d Cir. 1992). That said, the Second Circuit has acknowledged that "there may be cases where there is a direct correlation between gain and loss, such that the defendant's gain can act as a *measure* of — as opposed to a *substitute* for — the victim's loss." *Zangari*, 677 F.3d at 93 (emphasis in original) (citation omitted). That court was careful to emphasize, however, that some approximation of actual loss is needed in order to assess whether the defendant's gain serves as a reasonable estimate of the loss. *See id.* at 93–94. Otherwise, resort to the complexity exception, 18 U.S.C. § 3663A(c)(3)(B), or additional evidentiary proceedings, *id.* at § 3664(d),[2] is the appropriate course. *See Zangari*, 677

---

[2] The MVRA provides that a district court may decline to order restitution for a qualifying property offense if it finds, "from facts on the record," that:

    (A)    the number of identifiable victims is so large as to make restitution impracticable; or

    (B)    determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

F.3d at 93.

The government correctly notes that the Seventh Circuit in *United States v. Chay*, 281 F.3d 682 (7th Cir. 2002), affirmed a restitution award based on the gross proceeds of the defendant's fraudulent sales, i.e., the defendant's gain, *id.* at 687. In *Chay*, however, the defendant raised a different challenge to the restitution award, namely that the restitution amount should be reduced by the costs of his piracy, *id.* at 686, and thus the Seventh Circuit had no occasion to address the gain-versus-loss issue now before this court. *See id.* at 686–87 & n.2. It subsequently did in *George*, 403 F.3d 470, and held, in line with the other circuits, that "[r]estitution must be based on the victim's loss rather than the offender's gain." *Id.* at 474 (citations omitted). Somewhat similarly the Second Circuit in *United States v. Milstein*, 481 F.3d 132, 137 & n.3 (2d Cir. 2007), affirmed a restitution order based on a victim's lost sales where the defendant did not challenge the sales-profit distinction on appeal.

Because the plain text of the MVRA's authorization, 18 U.S.C. § 3663A(a)(1), reflects Congress' intent to compensate victims for the loss caused by the defendant's criminal conduct, *see id*. § 3664(f)(1)(A), we join the circuit courts of appeals and hold that in ordering restitution pursuant to the MVRA the district court may not substitute a defendant's ill-gotten gains for the victim's actual, provable loss. Victims of crime may achieve disgorgement of profits and ill-gotten gains through other statutory and civil-recovery mechanisms. *See, e.g.*, *Kuo*, 620 F.3d at 1164, 1166; *Chalupnik*, 514 F.3d at 754. For instance,

---

*Id.* § 3663A(c)(3). Or the district court may follow a less drastic path and attempt to alleviate the complexity by requiring additional documentation, hearing testimony, or referring the issue to a magistrate judge or special master. *Id.* § 3664(d).

the actual-damages provision for copyright infringement under Title 17 provides that "[t]he copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, *and* any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b) (emphasis added).

**B.**

In cases involving copyright infringement and fraudulent sales, the victim's actual loss typically equates to the profit the victim lost on the sales that were diverted from the victim as a result of the defendant's infringing sales. *See, e.g.*, *Chalupnik*, 514 F.3d at 755; *Hudson*, 483 F.3d at 710 & n.1; *Beydoun*, 469 F.3d at 107–08. Under this lost-profits on diverted-sales theory, the government must offer sufficient evidence to establish both the profit margin per sale and the number of sales lost. If the record does not demonstrate that the counterfeit goods ever reached the market, *see, e.g.*, *Beydoun*, 469 F.3d at 107–08; *United States v. Johnson*, 790 F. Supp. 2d 945, 946 (E.D. Wis. 2011); *United States v. Dove*, 585 F. Supp. 2d 865, 872 (W.D. Va. 2008), or that their introduction to the market in fact "thwarted" actual sales of the victim's product, *see, e.g.*, *Chalupnik*, 514 F.3d at 755; *Hudson*, 483 F.3d at 710; *Dove*, 585 F. Supp. 2d at 872, courts have held that no actual loss can be shown and restitution therefore is inappropriate. In this regard, the actual loss to the displaced (authentic) seller is the profit lost from the displaced sales — not the retail value of the goods that would have been sold. *Hudson*, 483 F.3d at 710 n.1; *Dove*, 585 F. Supp. 2d at 872; *cf. Chalupnik*, 514 F.3d at 755. The gross proceeds that the defendant collects from infringing sales are similarly an inappropriate gauge of the victim's lost profits.

In ordering Fair to pay restitution to Adobe Systems equivalent to his sales revenue, the district court abused its

discretion because the government failed to present evidence from which the district court could either determine Adobe Systems' actual loss or find that Fair's gain was a reasonable measure of that loss. The MVRA demands that restitution be awarded only for the victim's actual, provable loss, *see* 18 U.S.C. § 3663A(a)(2), (b)(1); *id*. § 3664(e), (f)(1)(a). Yet the government offered no evidence of either the number of sales that Adobe Systems likely lost as a result of Fair's scheme or the profit that Adobe Systems would have made on any such diverted sales. The record contains only a spreadsheet tallying Fair's eBay sales and unsubstantiated, generalized assertions of government counsel regarding Adobe Systems' lost sales. *See, e.g.*, Gov't's Mem. in Aid of Sent. at 6–9 & Attach. A (June 29, 2009); Gov't's Supp. Mem. in Aid of Sent. at 5, 8–9 (Oct. 13, 2009). There thus was no evidentiary basis on which the district court could find that had Fair's customers not purchased pirated Adobe software from him at a greatly reduced price, all or any portion of them would have purchased full-priced versions from Adobe Systems. Much as the Tenth Circuit observed in *Hudson*, 483 F.3d at 710, "we are very skeptical of the implicit suggestion that" customers' purchase of a certain number of copies of low-priced counterfeit software "proves that [those customers] would have agreed to purchase the same number of copies from [the legitimate seller]" for many times more.

Nor was there an evidentiary basis on which the district court could find that Fair's revenues represented profits that Adobe Systems would have otherwise gained. Adobe Systems' victim impact statement cited losses stemming from *all* software piracy in support of requesting the maximum sentence, whereas restitution under the MVRA is limited to the victim's losses from the defendant's offense conduct. Consequently, the district court's order that Fair pay Adobe Systems restitution in the amount of his unlawful sales revenue (minus the $24,367 it had already received from Fair's seized property) failed to conform

to the MVRA. As Fair states: "The restitution here was purely speculative. Thus, even if the government was correct that [Fair's] conduct 'deprives the rights['] owner of potential sales,' . . . it did not introduce evidence specifically identifying, or even estimating, sales lost to Adobe [Systems]." Appellant's Br. at 17.

The government maintains that because Fair "created any potential uncertainty in calculating pecuniary harm" by selling outdated counterfeit software, "[he] — not his victims — bears the risk of any uncertainty that his misconduct causes at the time of quantifying harm." Appellee's Br. at 26. It also maintains that the lost-profits rationale "makes no sense in the present context" because Adobe Systems no longer sells the versions of the software that Fair sold. These arguments are unpersuasive. As an initial matter, under the MVRA the government, not the defendant, carries the burden of proving the amount of the victim's loss. 18 U.S.C. § 3664(e). The cases on which the government relies are inapposite civil law cases, such as *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946) and *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931), which did not involve restitution awards and in which the amount of damages was not statutorily limited to the victim's actual, provable loss. Nor is this a case where a partial shift in the burden would be appropriate, where the defendant "deliberately destroyed" evidence relevant to the restitution calculation, *see Kuo*, 620 F.3d at 1167, or where the defendant is in a much better position than the government to ascertain the particular facts at issue, *see United States v. Archer*, 671 F.3d 149, 173 (2d Cir. 2011).

Furthermore, to the extent uncertainty exists as to Adobe Systems' profit margins on outdated products, the government fails to address why using profit margins from the company's current products would not represent a more accurate estimate

of actual loss than Fair's gross sales proceeds. At sentencing, the government counsel acknowledged that a market exists of "people who are likely to buy older but genuine product[s]." Tr. Oct. 22, 2009 at 22–23. Government counsel's statement that Adobe Systems had not conducted a study to determine the impact of infringement suggests a method that might have been used to provide the district court with relevant evidence to determine the amount of Adobe Systems' actual loss. Conceivably, as discussed during oral argument, Adobe Systems might have been able to survey Fair's customers to determine how many would likely have purchased full-cost updated versions of those Adobe products. *See* Oral Argument Tape 14:27–15:09. Additionally, the government offers no explanation of why Fair's customers' purchases of upgrades from Adobe Systems would not represent gains to the company or, for that matter, how the ability of Fair's customers to purchase upgrades would assist the district court in evaluating how many customers would have purchased new Adobe products at full price absent Fair's piracy.

To the extent the government defends the use of gross proceeds as "consistent with the calculation of loss under the Sentencing Guidelines," Appellee's Br. at 15, it ignores the different approaches in the Guidelines and the MVRA. Essentially, the government blurs the line between the "infringement amount" calculated under Sentencing Guidelines § 2B5.3 in criminal copyright cases, which is derived by multiplying the retail value of the infringed or infringing items by the quantity of infringing items, and the restitution amount calculated under the MVRA, which must reflect the actual, provable loss suffered by the victim. *See* Tr. Oct. 22, 2009 at 32–33; Appellee's Br. 15–17. The two calculations are distinct "given the different methods of calculation and different purposes of the calculation[s]" even if they may equate in some instances. *United States v. Yeung*, 672 F.3d 594, 604 (9th Cir.

2012) (citations omitted); *see also United States v. Huff*, 609 F.3d 1240, 1247–48 (11th Cir. 2010); *Singletary*, 649 F.3d at 1220; *Dove*, 585 F. Supp. 2d at 869. And "[u]nlike loss under the Guidelines, the MVRA requires proof of actual loss and does not allow alternative metrics, such as gain," *Gallant*, 537 F.3d at 1247 (citation omitted). Even under the Guidelines provision that permits a defendant's gain to be used as an alternative measure of loss for certain property offenses (not including criminal copyright infringement), the gain that resulted from the offense may be used "only if there is a loss but it reasonably cannot be determined." U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. 3(B) (2011). The MVRA offers a different alternative. *See* 18 U.S.C. § 3663A(c)(3), *supra* note 2.

Finally, the government's argument — that requiring proof of lost profits "would reward defendants by imposing on victims the difficult task of quantifying each lost sale resulting from their criminal conduct," Appellee's Br. at 18 — collapses under the plain text of the MVRA, which places the burden on the government, not the victim, to prove actual loss by a preponderance of the evidence. 18 U.S.C. § 3664(e). Moreover, the MVRA permits victims to recoup any necessary expenditures made during participation in the prosecution and investigation. *Id.* § 3663A(b)(4); *see generally Papagno*, 639 F.3d at 1097–1100. And in the event the actual-loss calculation is in fact too complex to permit a timely calculation of reasonable restitution, the MVRA envisions the appropriate path for a district court is to hold additional proceedings or to decline to order restitution at all, not to issue an order unsupported by the evidence. *See* 18 U.S.C. §§ 3663A(c)(3), 3664(d), *supra* note 2.

The abuse-of-discretion standard may be generous, *see Kickapoo Tribe v. Babbitt*, 43 F.3d 1491, 1497 (D.C. Cir. 1995) (citing Maurice Rosenberg, *Judicial Discretion of the Trial*

*Court: Viewed from Above*, 22 SYRACUSE L. REV. 635 (1971)),
but it is not one that will countenance the clear legal and factual
error present here.

## C.

The remaining question is the scope of a remand, if any.
The government seeks another opportunity to offer new evidence
of Adobe Systems' actual loss while Fair seeks vacation of the
restitution order for lack of record evidence to determine or
estimate Adobe Systems' actual loss. Any remand, Fair
alternatively suggests, should require resentencing based on the
existing record.

Although decided under the Sentencing Guidelines as
opposed to the MVRA, our decision in *Leonzo*, 50 F.3d 1086, is
on point. There, after concluding that the district court lacked
sufficient evidence to support its Guidelines loss calculation, the
court reversed and remanded for resentencing. *Leonzo*, 50 F.3d
at 1087. The Guidelines' calculation hinged on the size of the
loss taken on a fraudulently obtained loan on a particular
mortgaged property, and at sentencing the government offered
evidence only of the average loss to a portfolio including the
property in question, not evidence of the size of any loss the
victim suffered on that particular property. *Id.* at 1088. This
court restricted the remand proceedings to the existing record,
precluding the government from introducing new evidence in
support of its claim of loss. *Id.* The court explained that "[n]o
special circumstances justified, or even explained, the
government's failure to sustain [its] burdens [of production and
persuasion]." *Id.*; *see also Archer*, 671 F.3d at 168–69, 174.
Because the legal and factual positions regarding the
requirements of the MVRA were fully aired by the parties here
in the district court, we are unpersuaded that the government
should be permitted "a second bite at the apple" absent special

circumstances. *Leonzo*, 50 F.3d at 1088; *see also Singletary*, 649 F.3d at 1222.

In *United States v. Whren*, 111 F.3d 956 (D.C. Cir. 1997), the court applied the same rationale to hold that on remand for resentencing a defendant may not "raise for the first time a challenge to his sentence that is unrelated to the reason for the remand . . . unless his newly-raised objection to the sentence is based upon an error so plain that the district court or the court of appeals should have raised it for him." *Id.* at 957. The court elaborated that "upon a resentencing occasioned by a remand, unless the court of appeals expressly directs otherwise, the district court may consider only such new arguments *or new facts* as are made newly relevant by the court of appeals' decision — whether by the reasoning or by the result." *Id.* at 960 (emphasis added). The court stated that it saw no reason to distinguish the case before it — in which the party sought to raise a new legal argument on resentencing — from *Leonzo*, in which the government sought to introduce new evidence. *Id*. at 959. In adopting this so-called "waiver rule," the court rejected the "*de novo* rule," under which some circuits permit district courts to presume *de novo* resentencing on an open record unless specifically directed otherwise by the appellate court. *Id.* at 959–60 (collecting cases); *see also, e.g.*, *United States v. West*, 646 F.3d 745, 748–49 (10th Cir. 2011); *Kuo*, 620 F.3d at 1166 (9th Cir.). The court observed that the plain-error exception would suffice to protect against any risk of a miscarriage of justice. *See Whren,* 111 F.3d at 960 (citing FED. R. CRIM. P. 52(b)); *see also United States v. Johnson*, 378 F.3d 230, 243 (2d Cir. 2004). In *United States v. McCoy*, 313 F.3d 561 (D.C. Cir. 2002), the en banc court stepped further back from a bright line waiver rule, holding that *Whren* does not preclude a defendant from raising on remand an issue that was only contingently relevant in the original sentencing but became determinative under the remand order if the defendant can "establish 'good

cause,' within the meaning of Rule 32[(i)(1)(D)] of the Federal Rules of Criminal Procedure, for not having raised it sooner." *Id*. at 562.

No special circumstances are present that would warrant reopening the record on restitution in Fair's case. The government's burden to prove actual loss under the MVRA was well-established before sentencing. *See also* Tr. Oct. 22, 2009 at 23 (government counsel stating, "[w]e welcome the burden to prove restitution."). The government was allowed to present evidence, unlike in *Gallant*, 537 F.3d at 1222, 1254, and the demonstration of actual loss cannot be said to have been "contingent" at the original sentencing on the resolution of a different issue, *see McCoy*, 313 F.3d at 561–63. Indeed, whether the government had offered evidence demonstrating actual loss was the central issue addressed during the parties' restitution discussion at the sentencing hearing. *See, e.g.*, Tr. Oct. 22, 2009 at 20–28. Moreover, although this circuit had not spoken directly to the issue, other circuits had addressed the requirements of the MVRA's plain text prior to Fair's sentencing. Accordingly, because the government presented no evidence of Adobe System's actual loss as a result of Fair's sales of pirated copies of its software, we vacate the order of restitution.